UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

'08 CIV 6585



Olivia Almengor, Marissa Schain,
Daniel Bogatin,

*Plaintiffs,*

- against -

Benno C. Schmidt, *in his capacity as
Chairman of the Board of Trustees of
the City University of New York*, Philip
Alfonso Berry, Valerie Lancaster Beal,
Rita Dimartino, Freida D. Foster-
Tolbert, Joseph J. Lhota, Hugi M.
Morales, Peter S. Pantaleo, Kathleen
M. Pesile, Carol A. Robles Roman,
Marc V. Shaw, Charles A. Shorter,
Sam A. Sutton, Jeffrey S. Wisenfeld,
Robert Ramos, Manfred Philipp, *in
their capacities as trustees of the City
University of New York,* and Christoph
M. Kimmich, *in his capacity as the
President of Brooklyn College,*

*Defendants*

Civ. No.

Hon.

**Complaint for Declaratory and
Injunctive Relief**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### SUMMARY

1.      The City University of New York ("CUNY") is a network of public colleges,

including Brooklyn College, which are operated in, and by, the State of New York.

2.      Under the First and Fourteenth Amendments of the United States Constitution,

CUNY colleges may establish neutral public fora on their campuses to accommodate the

expression of diverse ideological viewpoints of registered student organizations ("RSOs").

3.     On the campus of Brooklyn College and other CUNY colleges, RSOs are eligible to receive and maintain funding through mandatory student activity fees when they follow CUNY and individual college rules relating to "fiscal accountability" and otherwise abide by certain regulations of general applicability.

4.     Such RSOs—which represent the rich and positive diversity of social, ethnic, political and religious viewpoints on the Brooklyn College campus—include Adventist Students for Christ, Anti-War Coalition, Asian Student Union, Association for Women in Science, Black Family Organization, Chinese Language and Culture Club, College Democrats, Desi Culture Club, Chinese Christian Fellowship, Dominican Student Movement, Hillel Club, Haitian American Student Association, Hispanic Society, International Socialist Club, Intervarsity Christian Fellowship, Islamic Society, Jewish National Fund on Campus, Lesbian, Gay, Bisexual, Transgendered Alliance, National Association for the Advancement of Colored People, New York State Israel Public Affairs Committee, Pan-African Student Alliance, Puerto Rican Alliance, Ramadan Committee, Students for Academic Freedom, Revolutionary Alliance of Womyn, and the Young Republicans.

5.     Under CUNY regulations, a "college association" chaired by the college president, or his or her designee, approve allocations of funds through the student activity fee. On the Brooklyn College campus, RSOs may be funded by the Student Government or student referendum. Funding by referendum remains in effect unless superseded by a subsequent referendum, which may increase, reduce, or eliminate the funding.

6.     At Brooklyn College, the New York Public Interest Research Group ("NYPIRG"), an off-campus not-for-profit organization with full-time staff, receives $5.00 and $3.00 of "extramural" fees from each full and part-time student, respectively, as a result of

referenda. NYPIRG receives an additional $5.00 per student for each of the two summer sessions as a result of a recent referendum.

7.      Under the color of state law, Defendants Benno C. Schmidt, Philip Alfonso Berry, Valerie Lancaster Beal, Rita Dimartino, Freida D. Foster-Tolbert, Joseph J. Lhota, Hugi M. Morales, Peter S. Pantaleo, Kathleen M. Pesile, Carol A. Robles Roman, Marc V. Shaw, Charles A. Shorter, Sam A. Sutton, Jeffrey S. Wisenfeld, Robert Ramos, Manfred Philipp, in their capacities as trustees of the City University of New York, and Christoph M. Kimmich, in his capacity as President of Brooklyn College (collectively, "Defendants") have promulgated, implemented and enforced rules, regulations, policies and practices that, in both purpose and effect, systemically favor the speech of NYPIRG and discriminate against all other RSOs funded through the student activity fee, including, but not limited to, those which specifically oppose the viewpoints of NYPIRG.

8.      Upon information and belief, Defendants continue to permit the funding of NYPIRG through the student activity fee based on *Carroll v. Blinkin*, 957 F.2d 991 (2d Cir. 1992) ("*Carroll I*"), 42 F.3d 122 (2d Cir. 1994) ("*Carroll II*"), which held that the funding of NYPIRG, an outside "ideological" organization, was an imposition on the First Amendment rights of students, justified only when university funding policies are viewpoint neutral and student fee money is spent on campus or otherwise for the benefit of students.

9.      Significantly, in the *Carroll* cases, the Second Circuit presumed viewpoint neutrality in NYPIRG's funding and that university and college administrators would ensure NYPIRG's compliance with *Carroll*. NYPIRG's funding structure on CUNY campuses, including Brooklyn College, has not been tested under *Southworth v. Bd. of Regents of the Univ. of Wis. Syst.*, 529 U.S. 217 (2000), *Amidon v. Student Ass'n of the State Univ. of New York*, 508

F.3d 94 (2d Cir. 2007), and other controlling precedent which establish the current legal framework for determining whether a public college administers the forum in a viewpoint neutral manner. Defendants' preferential treatment of NYPIRG must pass "strict scrutiny," but cannot satisfy any First Amendment standard.

10.    NYPIRG's funding is based on student referenda held on CUNY campuses, including Brooklyn College, since the 1970s, over the course of which the portion of the fee allocated to NYPIRG successively increased. As noted in *Southworth* and as held in *Amidon*, the referendum process to determine funding violates the principle of viewpoint neutrality by substituting a majority student vote for neutral criteria.

11.    There is no "opt-out" or "opt-in" provision on tuition slips for students who do not wish to fund NYPIRG; rather, the NYPIRG fee is refundable in accordance with procedures established by CUNY colleges which, upon information and belief, require students to visit the NYPIRG office on campus and to provide NYPIRG with their personal information.

12.    In addition to allowing funding based on referenda, Defendants exempt NYPIRG from strict fiscal controls applicable to all other RSOs.

13.    CUNY bylaw 16.1 purportedly requires that "all" student activity fees be deposited in a college "central depository," where they are subject to strict accounting rules and procedures. A separate CUNY regulation, however, requires that each college forward the "extramural" fee earmarked for NYPIRG off-campus to "NYPIRG, Inc.," where the funds are exempt from otherwise generally applicable fiscal controls, including review and approval of expenditures and disciplinary action for inadequate accounting.

14.     On several occasions in recent history, Brooklyn College administrators discontinued the funding of RSOs when the College Association or the Student Government failed to follow their own procedures.

15.     In one instance, Brooklyn College froze the budget of an RSO opposed to NYPIRG funding for non-compliance with CUNY and Brooklyn College regulations, which are not applicable to NYPIRG. As a result, students in this RSO lost access to their funds for "anti-NYPIRG" leaflets during the ten-day period set by Brooklyn College to petition for referenda.

16.     Defendants have also engaged in *de facto* discrimination in favor of NYPIRG and against opposition student organizations.

17.     When student organizations opposed to NYPIRG petition to hold referenda, Defendants, at the request of NYPIRG, have routinely disregarded their own regulations in order to remove from the ballot referenda questions that would reduce or eliminate the NYPIRG fee. On at least two occasions, only judicial intervention, in response to *pro se* student lawsuits, limited the effects of Defendants' discrimination.

18.     Defendants have also provided assistance to NYPIRG in the referendum process, including special access to legal advice denied to students seeking to defund NYPIRG.

19.     Further, under CUNY and Brooklyn College regulations, "research misconduct" is strictly prohibited and subject to investigation upon certain conditions. These regulations apply to students, professors, and others in the academic community.

20.     When fifty-nine professors in the science departments at CUNY, including Brooklyn College, concluded that NYPIRG—partly through staff members and student volunteers on campus—committed research misconduct and demanded an investigation, Defendants responded by exempting NYPIRG from the regulations and advised that their sole

recourse for allegations of research misconduct against NYPIRG was the student referendum process that, as noted, itself constitutes viewpoint discrimination when used to allocate student funding.

21.     Defendants have not limited their viewpoint discrimination to special exemptions for NYPIRG and *de facto* discrimination against "anti-NYPIRG" opposition student groups.

22.     NYPIRG is a multi-million dollar ideological organization composed of *off-campus professionals*, including lawyers and lobbyists which, as a result, has an unfair advantage in conveying its political message over RSOs, which receive only hundreds or thousands of dollars of strictly regulated student fees.

23.     Moreover, rather than be a neutral arbiter of the student forum, Defendants have formed a close ideological and administrative partnership with NYPIRG, which, in purpose and effect, allows NYPIRG to dominate the student forum.

24.     For example, CUNY granted NYPIRG membership on the Legislative Action Committee of the CUNY Board of Trustees; raises money for NYPIRG; allows NYPIRG staff to teach accredited courses in Political Science Departments at CUNY colleges, in which NYPIRG recruits student volunteers; and promotes NYPIRG's ideological messages.

25.     As a result of CUNY's regulations and practices, NYPIRG has become a partner or an arm of CUNY and Brooklyn College, not a mere participant in a neutral forum.

26.     Students may open a "chapter" of NYPIRG on campus, provided that such chapter—like the Brooklyn College NAACP or the Brooklyn College Young Republicans—is a true *student* group and subject to the same fiscal regulations as all other ideological RSOs.

27.     The Second Circuit's decision in *Carroll* as well as university regulations require NYPIRG to disclose financial information about expenditure of student fees and prohibit

6

NYPIRG from spending student fees on rent and administrative expenses for NYPIRG's main office.

28.    Defendants, however, do not enforce *Carroll* or these regulations.

29.    Since 2001, contrary to college regulations, Defendants have failed to require NYPIRG to file its annual report to the college president in the Brooklyn College Library.

30.    Plaintiffs have requested that Brooklyn College provide them with NYPIRG's financial reports to the college president and that CUNY provide them with NYPIRG's financial report to CUNY. To date, these reports have not been provided or otherwise made available to Plaintiffs.

31.    Further, NYPIRG's own filings with the IRS show that each year NYPIRG spends at least hundreds of thousands of dollars of student funds on expenses that *Carroll* and CUNY regulations prohibit.

32.    NYPIRG's self-described "mission" is "[t]o research and advocate contemporary change on social issues relating to consumer protection, environmental preservation, equal rights and government accountability." (NYPIRG "Mission Statement," available at http://students.brooklyn.cuny.edu/dirindex.htm.)

33.    Plaintiffs Olivia Almengor, Marissa Schain, and Daniel Bogatin (collectively, "Plaintiffs") object to the NYPIRG fee and disagree with NYPIRG's ideological agenda, methods of advocacy, and positions taken based, in part, on research which 59 CUNY scientists have characterized as deceptive and inappropriate for the University. Further, in their view, public policy should be influenced by sound science, not unsupported ideology. Plaintiffs also oppose CUNY's favoritism for NYPIRG's funding and their correspondingly diminished ability to compete for student fee funding on neutral terms.

## JURISDICTION AND VENUE

34.    Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 and § 1988 for deprivations of Plaintiffs' rights secured by the First and Fourteenth Amendments to the United States Constitution seeking injunctive and declaratory relief.

35.    This Court has jurisdiction under 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in the Court of all suits brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C.§ 1331 because the cause of action arises under the laws of the United States and the United States Constitution.  Plaintiffs also seek a declaration of their constitutional rights pursuant to 28 U.S.C. §§ 2201-02.

36.    Venue properly lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because the CUNY Defendants reside in this federal district.

## PARTIES

37.    Plaintiffs are students in good standing at Brooklyn College and each has paid, and for the remainder of their college education will continue to pay, the student activity fee.

38.    Ms. Almengor is a part-time student and, in August, will pay her student activity fee of $61.35, including $3.00 allocated to NYPIRG.

39.    Ms. Almengor, was a full-time student in the late 1990s, was a member of a now-defunct Brooklyn College RSO that petitioned and campaigned to eliminate NYPIRG's funding through the student activity fee at Brooklyn College.  She has returned to take courses after time off to raise a family.

40.    Ms. Schain is enrolled in the full-time program and for the Fall 2009 semester has paid her student activity fee of $100.55, including $5.00 allocated to NYPIRG.

41.    Mr. Bogatin is enrolled in the full-time program and for the Fall 2009 semester has paid his student activity fee of $100.55, including $5.00 allocated to NYPIRG.

42.    CUNY is an organization created by State law, and, upon information and belief, authorized by the State of New York and the Regents of the State University of New York to administer the various colleges, community colleges and graduate schools that are part of CUNY. Defendants Benno C. Schmidt, Philip Alfonso Berry, Valerie Lancaster Beal, Rita Dimartino, Freida D. Foster-Tolbert, Joseph J. Lhota, Hugi M. Morales, Peter S. Pantaleo, Kathleen M. Pesile, Carol A. Robles Roman, Marc V. Shaw, Charles A. Shorter, Sam A. Sutton, Jeffrey S. Wisenfeld, Robert Ramos, and Manfred Philipp are trustees of the City University of New York.

43.    Brooklyn College is a four-year college administered by CUNY. Defendant Christoph M. Kimmich is the President of Brooklyn College. He was appointed to that position by the Board of Trustees of CUNY.

44.    Defendants, through the use of the mandatory student activity fee, have created a public forum for speech.

## FACTUAL BACKGROUND

### A.    The Collection and Allocation of the Mandatory Student Activity Fee

45.    Before each semester commences, every Brooklyn College student is required to pay a mandatory student activity fee which amounts to $100.55 for full-time students and $61.35 for part-time students. (Brooklyn College Bulletin, "Tuition & Fees," p. 17.)

46.    As of the Fall and Spring of 2007, the portion of the student activity fee allocated to NYPIRG was $3.00 per full-time student and $2.00 per part-time student for each semester. (Brooklyn College Bulletin, "Tuition & Fees," p. 29-30.)

47. Brooklyn College collects additional student activity fees for each of the two summer sessions. In June 2007, based on referenda held at Brooklyn College, the CUNY Board of Trustees approved a $2.00 per student increase in the student activity fee for the Fall and Spring semesters and established a fee of $5.00 per student for each of the two summer sessions to be allocated to NYPIRG. (Minutes of the Board of Trustees of CUNY, dated June 25, 2007.) NYPIRG's summer fees are double the amount received by the Brooklyn College Student Government for the same period and most RSOs do not receive any funding at all in the summer.

48. Defendants enforce the nonpayment of student activity fees by withholding transcripts or refusing to allow students to register for classes. (Brooklyn College Bulletin, "Tuition & Fees," p. 17.)

49. The collection and allocation of the student activity fee at Brooklyn College is governed by a series of regulations set forth in the CITY UNIVERSITY FISCAL ACCOUNTABILITY HANDBOOK FOR THE CONTROL AND ACCOUNTABILITY OF STUDENT ACTIVITY FEES ("CUNY Fiscal Accountability Handbook") and BROOKLYN COLLEGE STUDENTS ORGANIZATIONS: FISCAL ACCOUNTABILITY GUIDELINES ("BC Fiscal Accountability Guidelines").

50. When there is an inconsistency between the two handbooks, *Students must abide by the more stringent college regulations where applicable*." (CUNY Fiscal Accountability Handbook, INTRODUCTION, emphasis in the original; BC Fiscal Accountability Guidelines, INTRODUCTION.)

51. The BC Fiscal Accountability Guidelines note that the CUNY Fiscal Accountability Handbook was "promulgated pursuant to section 16.8 of the [CUNY] Board of Trustees Bylaws" and the purpose of the Handbook "is to provide the regulations of CUNY for

the procedures and documentation necessary to protect the integrity, to ensure sound fiscal accountability, and adequate internal controls of *all* student activity fees." (BC Fiscal Accountability Guidelines, INTRODUCTION, emphasis added.)

52.    Each CUNY college, including Brooklyn College, is charged with establishing a "College Association," which consists of 13 members.  (CUNY Fiscal Accountability Handbook, II.C.)

53.    The governing board of the College Association is composed of:  (i) the college president or his/her designee as chair; and (ii) the administrative members appointed by the college president; (iii) three faculty members appointed by the college president; and (iv) six students from the student government. (CUNY Fiscal Accountability Handbook, II.C.)

54.    The College Association has a budget committee drawn from the governing board, at least a majority of whom are students. (CUNY Fiscal Accountability Handbook, II.C.)

55.    The budget committee is empowered to receive and review budget requests and to develop a budget "subject to the review of the college association." (CUNY Fiscal Accountability Handbook, II.C.)

56.    The College Association, in turn, "may choose to not approve the budget or portions of the budget if in their opinion such items are inappropriate, improper or inequitable." (CUNY Fiscal Accountability Handbook, II.C.)

57.    In accordance with CUNY bylaws, "the college association shall have responsibility for the supervision and review over college student activity fee supported budgets." (CUNY Fiscal Accountability Handbook, III.A.)

58.    Section 16.2 of the CUNY Bylaws provides that student activity fee funds shall be allocated and expended only for the following purposes:

1. Extracurricular educational programs;
2. Cultural and social activities;
3. Recreational and athletic programs;
4. Student Government;
5. Publications and other media;
6. Assistance to registered student organizations;
7. Community Service Programs;
8. Enhancement of the college and university environment;
9. Transportation, administration and insurance related to implementation of these activities;
10. Student services to supplement or add to those provided by the university;
11. Stipends to student leaders.

(CUNY Fiscal Accountability Handbook, III.B.; BC Fiscal Accountability Guidelines, I. STUDENT ACTIVITY FEE FUNDS, p. 3.)

59. Depending on the circumstances, the "allocating body" – the entity with responsibility for "allocating" or "budgeting" funds from student activity fees – may be the College Association or the Student Government. (CUNY Fiscal Accountability Handbook, III.B. & D.6.)

60. The budget for the Student Government, however, is "subject to review and approval by the college association budget committee" for conformance with Bylaw 16.2 and may be disapproved for non-conformance or impropriety or inequity. (CUNY Fiscal Accountability Handbook, III.B. & D.6.)

61. An RSO may be funded based on the results of a campus wide referendum.

62. An RSO under the referendum process asks whether all students should pay a certain dollar amount (e.g., should students be charged $5.00 per semester to be allocated to NYPIRG?).

63. The procedures for obtaining access to student referenda are set forth in 16.12 of the CUNY bylaws, which provides:

> A referendum proposing changes in the student activity fee shall be initiated by a petition of at least ten (10) percent of the appropriate

12

student body and voted upon in conjunction with student government elections.

Where a referendum seeks to earmark student activity fees for a specific purpose or organization without changing the total student activity fee, the results of the referendum shall be sent to the college association for implementation.

a. Where a referendum seeks to earmark student activity fees for a specific purpose or organization by changing the total student activity fee, the results of such referendum shall be sent to the board by the president of the college together with his/her recommendation.

b. At the initiation of a petition of at least ten (10) percent of the appropriate student body, the college president may schedule a student referendum at a convenient time other than in conjunction with student government elections.

c. Where the referendum seeks to affect the use or amount of student activity fees in the college purposes fund, the results of the referendum shall be sent to the [CUNY] board [of Trustees] by the college president together with his/her recommendation.

64.    When a portion of the student activity is "earmarked" by referendum, "such earmarking remains in effect until superseded by a later student referendum." (CUNY Fiscal Accountability Handbook, II.E.1.)

65.    NYPIRG receives its funding as a result of a series of student referenda held under the procedures set forth in CUNY Bylaw 16.12.

66.    The referendum method of student fee funding—which substitutes majority vote for viewpoint neutrality—has already been held unconstitutional by the Second Circuit in *Amidon*, which applied the Supreme Court's reasoning in *Southworth*. The same principles of viewpoint neutrality announced in these cases render constitutionally infirm Defendants' preferential funding of NYPIRG.

**B.      Defendants Exempt NYPIRG from A Series of Strict Fiscal Controls
Imposed On All Other Ideological Groups which Are Funded Through the
Student Activity Fee**

67.      Through selective application of CUNY fiscal regulations, Defendants give

NYPIRG preferential treatment with respect to funding through the student activity fee.

68.      Board of Trustees Bylaw 16.1 purports to requires that "all" student activity fees

be deposited in a college "central depository," where they are subject to certain fiscal controls.

(CUNY Fiscal Accountability Handbook, IV.C.; BC Fiscal Accountability Guidelines, I.

STUDENT ACTIVITY FEE FUNDS, p.3.)

69.      To allow NYPIRG's portion of the student activity fee—or what is actually a

separate "NYPIRG fee"—to be transferred off-campus, where it is not subject to these fiscal

controls, CUNY Bylaw 16.11e creates a special  category for NYPIRG entitled "recipients of

extramural student fees."  Under Bylaw 16.1, CUNY colleges with a NYPIRG chapter, including

Brooklyn College, collect and transmit NYPIRG's fee to an off-campus account of "NYPIRG,

Inc." (CUNY Fiscal Accountability Guidelines, IV.F; BC Fiscal Accountability Guidelines, I.

STUDENT ACTIVITY FEE FUNDS, p.3.)

70.      CUNY Bylaw 16.2, however, provides for the College Association to review prior

to expenditure "all budgets of college student fees," except where CUNY has "earmarked"

student fee money "to be allocated by another body."  Because CUNY has so "earmarked"

NYPIRG's funding, which is "extramural," NYPIRG's budget, unlike any other ideological RSO

– referendum-funded or otherwise – is not subject to such review by the College Association.

71.      CUNY Bylaw 15.2b.1 grants student government the power to regulate

intracollegiate teams, publications, organizations, associations, clubs or chapters. (CUNY Fiscal

Accountability Handbook, IV.C.; BC Fiscal Accountability Guidelines, I. BUDGET

ALLOCATION, p.6.)  Because CUNY has so "earmarked" NYPIRG's funding, which is

"extramural," NYPIRG's budget, unlike any other ideological RSO – referendum-funded or otherwise – is not subject to such review by the Student Government either.

72.     As mandated by the Board of Trustees, under CUNY Bylaw 16.3, the College Association "shall review all student activity fees, including student government fee allocations and expenditures for conformance with the expenditure categories and shall disapprove any allocation or expenditures for student organizations it finds does not so conform, or is inappropriate, improper, or inequitable." CUNY Bylaw 16.6 provides that "All funds are to be disbursed only in accordance with approved budgets and be based on written documentation." The NYPIRG fee is not subject to these regulations.

73.     Students may be held "personally liable for any debts incurred" as a result of "deficit spending" and students "who fail to properly account for student activity fee funds may be determined delinquent . . . may be barred from registration or receiving a transcript or degree until a proper accounting or restitution is made" and otherwise are subject to various forms of "discipline set forth in subject to the Student Disciplinary Procedures of Article XV of the Bylaws of the [CUNY] Board of Trustees." (CUNY Fiscal Accountability Handbook, IV.C.; BC Fiscal Accountability Guidelines, I. STUDENT ACTIVITY FEE FUNDS, p.3.) NYPIRG is not subject to these regulations.

74.     RSOs must obtain multiple bids for purchases unless an exception applies. (CUNY Fiscal Accountability Handbook, V. PURCHASING, p.29.) At Brooklyn College, "Any expenditure over $250 *must be discussed with C.D.* [Central Depository] because your [RSO] expenditure must have three (3) bids." (BC Fiscal Accountability Guidelines GENERAL RULES, p.2, emphasis added.) NYPIRG is not subject to these regulations.

75.    Brooklyn College RSOs must submit to Central Depository an itemized budget based on specific categories set forth in Brooklyn College rules. For RSOs to modify their budget lines, *i.e.*, move money from one line item to another, they must complete a "budget modification form" in Central Depository. Modification in excess of 10% must be approved by the College Association Budget Committee, the Student Government or other allocating body. (BC Fiscal Accountability Guidelines, IX. CASH ADVANCES, p.9.) NYPIRG, an allocating body unto itself, is not subject to these regulations.

76.    A "cash advance" for RSOs is limited to $100.00 and receipts for them must be submitted to Central Depository within one week of receiving the advance. (BC Fiscal Accountability Guidelines, IX. CASH ADVANCES, p.9.) Since the NYPIRG fee is sent off campus to NYPIRG, NYPIRG is not subject to this regulation.

77.    At Brooklyn College, "Only students may be hired to full-time positions funded from the student activity fee and the Budget Committee of the B.C.A. [Brooklyn College Association] must approve any exceptions." (BC Fiscal Accountability Guidelines, XXIV, SALARIES/STIPENDS, p.17.) NYPIRG's two "project coordinators" assigned to the Brooklyn College campus are not students, but full-time employees of NYPIRG, and their salaries are funded through the student activity fee. NYPIRG is thus exempt from the Brooklyn College regulation on salaries and stipends. The funding of NYPIRG salaries from the student fee is not even a result of College Association's exceptional approval power.

78.    Under CUNY and Brooklyn College rules, "ORGANIZATION FUNDS WILL BE FROZEN" when the student organization has any "OUTSTANDING OBLIGATIONS." (BC Fiscal Accountability Guidelines, GENERAL RULES, p.2.)

79.    In the Spring of 1998, the Central Depository of Brooklyn College froze the budget of Students for Advocacy Group Accountability ("SAGA"), an RSO opposed to the funding of NYPIRG, for failure to submit an updated list of members and officers to the Brooklyn College Administration.

80.    As a result, SAGA was unable to obtain club funds for duplication of "anti-NYPIRG" leaflets during the ten-day period designated by the college to petition for referenda. (Affidavit of Jennifer Zinamon, dated January 21, 2000.)

81.    In November of 2007, the budgets of all RSOs, except for NYPIRG, were discontinued because Student Government failed to meet with a quorum. (Asya Farr, *Brooklyn College Excelsior*, "SG and B.C. Admin. Dispute Leaves Clubs in Limbo," Nov. 5, 2007.)

82.    Similarly, the year before, the College Association failed to meet with a quorum as a result of which RSO funding was "postponed" and RSOs could not receive funding as predicted. ("BCA Postponed," *Brooklyn College Excelsior*, September 25, 2006.)  The College Association's failure, however, did not affect NYPIRG's "extramural" funding.

83.    Initial funding through non-referenda is generally limited to a few hundred dollars for the first year with moderate increases each subsequent year if the RSO meets Defendants' fiscal requirements.

84.    NYPIRG—which obtains more than $100,000 annually from Brooklyn College student fees alone compared to a few hundred or thousand dollars that other student groups receive—is not subject to the same consequences for non-compliance with College rules, nor can NYPIRG's funding be "FROZEN" or otherwise affected adversely by Student Government's failure to achieve a quorum or by the inaction of the College Association.

85.     Surpluses in the funds of RSOs "are not to be carried over" to the following fiscal year, unless approved by a 2/3 vote of the College Association to a maximum of 10% of the budget or $500, whichever is less. (CUNY Fiscal Accountability Handbook, XII.) The Brooklyn College rule likewise requires their "return" to the allocating body or the College Association subject to retention based on approval by a 2/3 vote of the College Association to a maximum of 10% of the budget or $500, whichever is less. (BC Fiscal Accountability Guidelines, VI. BUDGET ALLOCATIONS, p. 3.)

86.     NYPIRG, in contrast, is exempt from these CUNY and Brooklyn College regulations and is automatically permitted to carry over surpluses. (CUNY Fiscal Accountability Handbook, XIV.D.)

87.     In 1997, the Brooklyn College Administration—in an act of unbridled discretion—gave "one student group," NYPIRG, $10,698 in surplus funds from the student activity fee. (Cheryl Felsenberg, "Show Me the Money," *Brooklyn College Excelsior*, Mar. 10, 1997.)

88.     A variety of additional CUNY and Brooklyn College fiscal controls in specific circumstances are applicable to all ideological RSOs, except for NYPIRG.

C.      **Defendants Exacerbate the Viewpoint Discrimination in the Referendum Process By Engaging in *De Facto* Discrimination Against Students and RSOs That Oppose NYPIRG Funding**

89.     The referendum process itself constitutes *per se* viewpoint discrimination in violation of Plaintiffs' constitutional rights; CUNY adds to the violation by *de facto* discrimination in favor of NYPIRG's funding and speech.

*Advice to NYPIRG, But Not to "Anti-NYPIRG," on the "Legality" of Referenda Questions*

90.     CUNY and Brooklyn College have denied students equal access to legal advice and blocked "anti-NYPIRG" efforts to petition for referenda to reduce or eliminate the NYPIRG fee.

91.     On January 17, 1990, two students and the Chairperson of NYPIRG's Board of Directors asked the Office of the General Counsel and Vice Chancellor for Legal Affairs of CUNY for an opinion on the legality of a proposed referendum question that would have affected NYPIRG funding.  (Letter from Helen Coley, Gregorio Mayers, and Margaret A. Peckham to Vice Chancellor Michael D. Solomon, dated January 17, 1990.)

92.     Then Acting General Counsel and Vice Chancellor for Legal Affairs, Michael D. Solomon, responded promptly with advice in a letter to the President of the College and copied the students who wrote him.  (Letter from Vice Chancellor Michael D. Solomon to President Tilden J. Lemelle, dated January 30, 1990.)

93.     In his contemporaneous letter to the students and NYPIRG, Mr. Solomon wrote: "In response to your letter dated January 17, 1990, I am enclosing a copy of my letter dated January 30, 1990 to President Tilden LeMelle."  (Letter from Vice Chancellor Michael D. Solomon to Helen Coley, Gregorio Mayers, and Margaret A. Peckham, dated January 30, 1990.)

94.     In 1994, a group of students called "MaryAnne and Her Friends," which, at the time was led by students W. ("Kit") Leung and Simone Cowen, petitioned the student body to place a referendum question on the ballot to reduce NYPIRG's funding through the student activity fee.

95.     Because NYPIRG opposed the referendum, Ms. Leung wrote to CUNY's General Counsel and Vice Chancellor of Legal Affairs for advice.

96.      In his response, dated March 2, 1994, Mr. Solomon this time indicated that, "This office serves as counsel to the university and college administrations, and therefore does not respond directly to student inquiries." (Letter from Vice Chancellor Michael D. Solomon to W. Leung, dated March 2, 1994.)

97.      Mr. Solomon did not on his own initiative—as he did four years earlier for other students and NYPIRG—write to the college president and copy Ms. Leung. Instead, the same letter referred Ms. Leung to Hilary Gold, the Vice President of the College. By this time, Robert Jefferson, the Associate Dean from whom Ms. Leung had also requested advice prior to writing to Vice Chancellor Solomon, approved the question orally but did not, as promised, give her a final decision. (Letter from W. Leung and Simon Cowen to Brooklyn College President Vernon Lattin, dated May 4, 1994, p. 4.)

### Interference with "anti-NYPIRG" Referenda

98.      In May 1994, at the request of NYPIRG, the Brooklyn College Student Election Review Committee ("SERC") belatedly disqualified the question for which Ms. Leung so diligently sought advance approval from CUNY and Brooklyn College, even though she and other students had obtained the requisite number of valid signatures to place the question on the student election ballot.

99.      The question read: "Should the $3.00 per student per semester NYPIRG fee for the support of the New York Public Interest Research Group be reduced to $1.50?"

100.     Shortly before the election, SERC, based on arguments from NYPIRG—and the Brooklyn College Lay Advocate which represented a NYPIRG student volunteer—removed the question from the ballot on the grounds that "should" suggested a "yes or no" opinion which

SERC claimed was contrary to CUNY bylaw 16.12. (SERC Minutes and decision letter, dated May 2, 1994.)

101.    Ms. Leung appealed to Vice President Gold for relief, noting that her question was modeled on one approved by the CUNY Board of Trustees; University and College administrators never responded to her requests to approve the wording of the question; and a NYPIRG member on SERC failed to recuse herself. (Letter from W. Leung to Vice President Hilary A. Gold, dated May 11, 1995.)

102.    Rather than correct this pretextual defect, by, for example, changing "should" to "shall," Vice President Gold—to whom Mr. Solomon referred Ms. Leung for help—affirmed, without specifying the reason, the decision of SERC to disqualify the question from the ballot. (Letter from Brooklyn College Vice President Hilary A. Gold to "MaryAnne and Her Friends," *et al.*, dated May 5, 1994.)

103.    Although, according to the May 5, 1994 SERC minutes, Shannon Scire, a NYPIRG member who sat on SERC, "recused himself" from deliberations, Vice President Gold subsequently met with Mr. Scire *ex parte* to discuss Ms. Leung's appeal of SERC's decision. (Sam Monroe, *Brooklyn College Excelsior*, "Anti-NYPIRG Rejected," dated May 9, 1994.)

104.    Further, as noted in Ms. Leung's letter to Vice President Gold, another self-described NYPIRG "Coordinator" and "supporter" on SERC, Patricia Iovine (*Brooklyn College Excelsior*, Apr. 4, 1994, full page ad asking students to support NYPIRG funding; "NYPIRG is a Benefit to the Campus," *Brooklyn College Excelsior*, May 8, 1995), did not even recuse herself, but subsequently voted to remove the "Anti-NYPIRG" referendum question from the ballot (Minutes of SERC, dated May 2, 1994), in an unremedied violation of Brooklyn College

conflict-of-interest rules barring an "advocate" or "member of a group" from "participat[ing] in the decision" relating to that group. (SERC rules, art. 14.)

105.    In contrast to this biased action of SERC and Vice President Gold, "defective" referenda questions involving NYPIRG have not been invalidated and, in fact, the CUNY Board of Trustees, on at least one known occasion in 1992, *sua sponte* and retroactively corrected a defective NYPIRG question after the referendum was held.

106.    Students at Brooklyn College voted to increase NYPIRG's funding from $2.00 to $3.00 per student but, contrary to the requirement of Bylaw 16.12, the question was "silent as to any change in the total student activity fee." The Board of Trustees nonetheless gave effect to the referendum results based on the Brooklyn College President's determination "that it was the intent of the referendum to increase the student activity fee." (Minutes of the Board of Trustees of CUNY, dated January 24, 1994, p.26.)

107.    Through unusual initiative and effort, some students seeking to reduce or eliminate the NYPIRG fee at Brooklyn College were able to minimize the impact of Defendants' discrimination against their viewpoint by filing *pro se* actions in federal court.

108.    In April 1998, when "anti-NYPIRG" students were petitioning to hold a referendum on NYPIRG's funding, NYPIRG members placed a small ad in a Brooklyn College student newspaper advertising a Friday afternoon meeting to "reactivate" SAGA, an RSO that opposed NYPIRG's funding through the student fee. The ad identified its author only by the pseudonymous email address "dahoo@rocketmail.com" (*Excalibur*, Wednesday, April 1, 1998), which students later discovered to be that of a NYPIRG Project Leader.

109.    Unbeknownst to actual SAGA members and supporters, NYPIRG held the advertised meeting at which student volunteers and open supporters of NYPIRG voted

themselves in power to prevent SAGA from obtaining funds to campaign for the imminent May referendum to reduce NYPIRG's funding. The NYPIRG Project Leader, who has since become a full-time NYPIRG employee, was voted the Secretary of SAGA by his fellow NYPIRG members. (Election Minutes of SAGA, dated April 3, 1998.)

110.    NYPIRG's attempt to coopt SAGA was not recognized by Brooklyn College, but SAGA, discouraged by NYPIRG's intimidation and systemic disadvantages in the forum, dissolved as an RSO. Individual students, however, continued to petition for referenda to reduce or eliminate NYPIRG funding.

111.    The same month that NYPIRG attempted to coopt SAGA, Brooklyn College students Amy Cai and Miriam Ehrman filed an action on their own behalf in the United States District Court for the Eastern District of New York when Brooklyn College administrators refused to provide them with petitions to collect signatures to place an "anti-NYPIRG" referendum question on the ballot.

112.    The Honorable Fredric Block, District Court Judge, ordered Brooklyn College to provide petitions to the students and maintained continuing jurisdiction over the controversy to ensure compliance. (*Cai, et al. v. Brooklyn College, et al.*, No. 98-CV-2736 (E.D.N.Y. Apr. 17, 1998; *Cai, et al. v. Brooklyn College, et al.*, No. 98-CV-2736 (E.D.N.Y. Apr. 29, 1998).

113.    In 2001, Brooklyn College administrators again refused to provide students with petition forms to collect signatures for a referendum on whether to reduce NYPIRG's funding.

114.    After *pro se* students Irene Kokotas and Katherina Singh filed an action for injunctive relief in federal court, the Brooklyn College provided the petitions, as required. Even then, the College denied students the full ten-day period for petitioning. Only at the hearing in Court did the College agree to allow the students the full ten-day period. Brooklyn College's

belated compliance was recorded in the Report & Recommendation of the Honorable Magistrate Judge Joan M. Azrack. (*Kokotas, et al v. Brooklyn College, et. al*, CV-01-1853 (Apr. 10, 2001).

115.    NYPIRG and CUNY's interference with "anti-NYPIRG" petitioners on public university campuses has been a recurring problem that has minimized or altogether suppressed opposing views. Long before the Supreme Court reinforced the constitutional mandate of viewpoint neutrality in *Southworth*, a student newspaper at New York Technical College reported that counsel for an "anti-NYPIRG group" complained about NYPIRG and CUNY's interference with their rights to campaign against the NYPIRG fee:

> "Actions by NYPIRG and some college Administrators have violated First Amendment rights of students and have had the appearance of partiality for NYPIRG. In one of the most flagrant examples, several college administrators prohibited student candidates from discussing NYPIRG or the NYPIRG fee referendum at a pre-election forum."

("'NYPIRG Stalked Me,'" excerpt from *New Tech Times*, May 1994, p.4; *see also* "[NYPIRG] Stalks and Harasses Student Activists," excerpt from *Spheric*, Hunter College newspaper, Oct. 1994.)

116.    This allegation of CUNY's assistance to NYPIRG is corroborated by the two federal lawsuits, which were necessary to prevent Brooklyn College administrators and NYPIRG from completely disallowing students from petitioning to hold a referendum to reduce or eliminate the NYPIRG fee.

117.    While the *pro se* Brooklyn College students succeeded, where others have failed, their comparatively minimal resources and efforts were directed into merely restoring their rights to petition and to vote on referenda.

### Exemption of NYPIRG Staff and Students From Rules of Academic Discipline

118.    CUNY and Brooklyn College extend preferential treatment to NYPIRG staff and students in the dissemination of research results.

119.    The alleged "purpose" of NYPIRG "is to investigate and research public policy issues of special interest to the students." (Minutes of Board of Trustees of CUNY, dated June 22, 1992.)

120.    NYPIRG staff conduct research and disseminate to the media and others the results of NYPIRG "studies," which are not peer reviewed, as are scientific studies published in academic journals.

121.    NYPIRG staff teach accredited courses in Urban Fieldwork in the Political Science Department of Brooklyn College (Brooklyn College Bulletin of Classes, available at www.brooklyn.cuny.edu/bc/pubs/bulletin/) and provide internships for credit ("NYPIRG on Campus," available at www.nypirg.org/oncampus/internships.html.)

122.    One NYPIRG staff member who teaches such a course publicized a NYPIRG study evaluating the Scholastic Aptitude Test ("SAT"). ("Are Tests Up To Standard," *Brooklyn College Excelsior*, October 3, 1994.)

123.    Students on various CUNY campuses, such as Brooklyn College, have assisted in the preparation of NYPIRG research, including, for example, a research study on recycling. (NYPIRG, *The Burning Question: Garbage Incineration versus Total Recycling in New York City* (1986)).

124.    David Seidemann, a professor of geology at Brooklyn College, has publicly alleged that NYPIRG uses fraudulent methods to conduct research, and he works with a small group of students and faculty members in opposition to NYPIRG's funding and relationship with the University.

125.    In 1997, based on evidence provided by Professor Seidemann, the Geology and Physics Departments at Brooklyn College issued a press release stating that NYPIRG "falsified

data" and "fabricated conclusions" in its studies, including those relating to the SAT and recycling referred to above. As the press release noted, 59 scientists at Brooklyn College signed a petition indicating that NYPIRG "engages in unacceptable research practices, including those that rise to the level of misconduct as defined by the National Academy of Sciences." (Press Release from Brooklyn College Departments of Geology & Physics, dated February 24, 1997.)

126.    At the relevant time and to present, research misconduct of students and faculty are subject to review and investigation through CUNY regulations, which provide in relevant part: "Misconduct in Research means fabrication, falsification, . . . deception or other practices that seriously deviate from those that are commonly accepted in the scientific community for proposing, conducting, or reporting research . . . . . The president of each college within the University or his or her designee shall be responsible for designating an appropriate college official to receive allegations of misconduct in research involving faculty, other employees or students." The same regulations provide the procedures for an "inquiry" and, if warranted, a "formal investigation." (Minutes of the CUNY Board of Trustees, dated January 29, 1990.)

127.    John A. Chamberlain, Jr., the Chairman of the Geology Department at Brooklyn College, informed CUNY of "conclusive evidence" of NYPIRG's research misconduct, which warranted an investigation and suspension of CUNY's relationship with NYPIRG. (Letter from John A. Chamberlain to Acting Chancellor Anne L. Martin, dated November 27, 1996; Letters from John A. Chamberlain to Chancellor W. Anne Reynolds, dated October 7, 1996 and March 24, 1997; Letter from John A. Chamberlain to Trustee Dr. Anne Attura Paolucci, dated March 31, 1997.)

128.    Professor Chamberlain sent numerous such letters to various CUNY trustees and the Chancellor's office to which the responses were invariably refusals to investigate on the purported ground that the research was not conducted by CUNY professors or students.

129.    In his November 27, 1996 letter to Acting Chancellor Martin—which was a reply to one of her prior responses—Professor Chamberlain noted that students were involved in NYPIRG research and that research by NYPIRG staff may harm students.

130.    In response to that letter, Acting Chancellor Martin reiterated her "view that there seems to be no basis for further action on our part." (Letter from Acting Vice Chancellor Anne L. Martin to John A. Chamberlain, dated December 10, 1996.)

131.    In response another one of Professor Chamberlain's letters, the office of the Vice Chancellor of CUNY refused to "intervene in this matter" and suggested that the Chairman's proposal and, by implication, charges of research fraud, would be "best addressed through the process described in Section 16.12 of the Bylaws of the Board of Trustees concerning student referenda on changes in the student activity fee." (Letter of Vice Chancellor Brenda Richardson Malone to John A. Chamberlain, dated May 18, 1997.)

132.    Similarly, CUNY trustee George Rios explained that the student referendum process was available to address NYPIRG funding and that no "investigation was undertaken" because "'the research in question was not conducted by CUNY faculty or staff." (Letter from Trustee George J. Rios to John A. Chamberlain, dated July 2, 1997.)

133.    Professor Charles Landeman, a retired professor of Philosophy and a Member of the Executive Committee of the CUNY Association of Scholars, also requested an investigation of NYPIRG's research. (Letter from Charles Landeman to Trustee Dr. Anne A Paolucci, dated October 14, 1998.)

134.    Vice Chancellor Lius Mirrer responded that because "the research was not conducted by or on behalf of CUNY" no investigation was warranted.  (Letter from Vice Chancellor Dr. Louise Mirrer to Charles Landeman, dated November 3, 1998.)

135.    Professor Landeman subsequently replied and noted, as had Professor Chamberlain, that NYPIRG adjuncts and students are connected to NYPIRG's research and employees of NYPIRG teach courses at the college.  (Letter from Charles Landeman to Vice Chancellor Dr. Loiuse Mirrer, dated March 4, 1999.)

136.    CUNY officials never investigated NYPIRG, even though, contrary to their denials, CUNY faculty (NYPIRG staff) and CUNY students were involved in NYPIRG research.

137.    On October 28, 1996, Vice Chancellor of University Relations, Jay Hershenson, forwarded a letter from NYPIRG's Executive Director Jay Halfon denying Professor Seidemann's allegations of research misconduct.

138.    Vice Chancellor Hershenson noted that "Trustee Badillo" asked him to "check . . . out and handle, as appropriate" Professor Chamberlain's letter to Badillo.  (Memorandum from Vice Chancellor Jay Hershenson to Chancellor W. Ann Reynolds, dated October 28, 1996.)

139.    Vice Chancellor Hershenson did not mention that he was one of NYPIRG's "founding members" in the 1970s.  ("NYPIRG Rallies in Albany," *Statesman*, March 10, 1998; "NYPIRG friends," available at www.nypirgfriends.org.)

140.    Thus, while professors and students are subject to inquiry, investigation and/or discipline for research misconduct under university regulations, Defendants have exempted NYPIRG staff and students from such regulations and have determined that whether NYPIRG committed research misconduct is a question subject to popular student vote.

141.    The evidence of bias in the referendum process and Defendants' refusal to apply academic rules to similarly situated NYPIRG faculty and Brooklyn College students—while not necessary to invalidate CUNY's preferential deregulation of NYPIRG funding—confirm more than the "covert" bias in the forum about which the Second Circuit warned in *Amidon*.

142.    Such evidence also supports, as set forth below, Plaintiffs' allegation that CUNY is a partner of NYPIRG, not a neutral arbiter of the student forum.

### D.    With CUNY's Assistance, NYPIRG, An Off-Campus Organization Composed of Full-time Non-Student Professionals, Dominates the Forum

143.    NYPIRG is an off-campus organization composed of full-time non-student professionals, notably lawyers and lobbyists, and wields millions of dollars in resources, including almost $2 million per year in student fees and about $3.6 million more from outside sources, which are deposited into a related organization with the same address known as the "NYPIRG Fund."[1]

144.    NYPIRG describes the relationship between the two entities as "historic and continuing." (NYPIRG Fund, 2005 IRS Form 990.)

145.    Defendants allow NYPIRG to dominate the student forum which is otherwise composed of student groups with only hundreds or thousands of dollars of regulated student fees.

146.    Student groups, such as SAGA, which are funded through Student Government, only received a few hundred dollars in their first year and double that amount in the second.

147.    NYPIRG, however, is not only an outside participant in the student forum with inherent advantages—in the form of vaster resources that cannot be matched by less sophisticated non-professional students with little student fee money and strict fiscal controls on their expenditure.  Rather, CUNY places the *imprimatur of State approval* on NYPIRG's speech,

---

[1] Unless otherwise indicated, "NYPIRG" refers to "NYPIRG, Inc."

which further allows NYPIRG, an off-campus organization of full-time professionals, to dominate the *student* forum.

148.    CUNY officials appointed NYPIRG to the Lobbying and Legislative Action Committee of the Board of Trustees of CUNY, which promotes increased public funding for CUNY. (CUNY Legislative Action Committee Directory, 2007.)

149.    Pursuant to this partnership, CUNY and NYPIRG engage in joint lobbying efforts. In one instance, CUNY Trustee Agnes Abraham went "on the record [to] applaud NYPIRG for . . . helping us [CUNY] with our advocacy both in City Hall and in Albany and nationwide." (Minutes of the Board of Trustees of CUNY, dated June 28, 2004.)

150.    CUNY officials conduct fundraisers for a number of state and national organizations, including NYPIRG, but no other RSO funded through the student fee. ("Message from Chancellor Matthew Goldstein to the City University of New York.")

151.    CUNY and Brooklyn College officials allow NYPIRG staff to teach accredited courses in the Political Science departments on various CUNY campuses, including "POL 75.5 Urban Fieldwork I" and "POL 75.6 Urban Fieldwork II" at Brooklyn College. Further, based on their neutral description in the Course Catalogue, these offerings do not, in any fashion, indicate to students that their instructors are the staff of NYPIRG, an ideological organization. (www.brooklyn.cuny.edu /courses/acad/courses_list.)

152.    In addition to providing NYPIRG staff with teaching privileges, CUNY and Brooklyn College officials permit NYPIRG to use these classes as a recruiting tool for volunteer "project leaders." ("Political Science 75.5/75.6, Urban Field Work, 'The NYPIRG Class,'" syllabus of instructors Elisabeth Marks and Michael Hernandez.)

153.    A NYPIRG staff member, in an internal transition memorandum for his

successor—which was leaked by former NYPIRG affiliated students at the College of Staten

Island—noted that "I would definitely be more selective of who you allow into the course and

would try to make sure they were project leader material. . . ." ("CSI Transition Memo," p. 6.)

154.    CUNY and Brooklyn College officials promote NYPIRG's message and agenda

by, *inter alia*, allowing NYPIRG to place inexpensive, but matching, stickers at a cost of a few

hundred dollars on CUNY's $30,000 recycling bins, which refer students to the NYPIRG office

for more information. (Sam Munroe, "Blue Cans at B.C.," *Brooklyn College Excelsior*, Feb. 3,

1994, p.5; sticker on recycling bin; full page ad of Brooklyn College Administration). Similarly,

they promote NYPIRG in student publications. (*Brooklyn College Notes*, Apr. 3, 1990.)

155.    NYPIRG already has an inherent advantage in the form of vast resources—in both

millions of dollars per year and full-time professional staff—that permit NYPIRG to dominate

the student forum on CUNY campuses and, by forming a lobbying partnership with NYPIRG, by

allowing NYPIRG to join the faculty as adjuncts and to recruit student volunteers for NYPIRG,

and by promoting NYPIRG to the students, Defendants abdicate their required role as neutral

arbiter of the student forum and further increase NYPIRG's impermissible dominance of that

forum.

156.    CUNY and Brooklyn College officials *may* engage in their own speech, *may* form

partnerships with outside organizations to the extent otherwise permitted by law, and *may* hire

NYPIRG employees as adjuncts; and student supporters of NYPIRG *may* register a "chapter" of

NYPIRG on campus under neutral funding rules—as have, for example, the Brooklyn College

Young Democrats and the Brooklyn College NAACP. But CUNY, a "neutral" arbiter of the

student forum created by mandatory student activity fees, may *not* allow an outside organization

31

of non-student professional lawyers and lobbyists with vast resources, which functions as

CUNY's partner, to extract *student* fee monies.

157.    Defendants' relationship with NYPIRG explains, but does not justify, their

assistance to NYPIRG in interfering with petitioners seeking to decrease or eliminate NYPIRG

funding on CUNY campuses, providing selective legal advice to NYPIRG, and refusing to apply

the rules of academic misconduct to NYPIRG staff and students.

### E.    CUNY Fails to Enforce Restrictions on NYPIRG's Off-Campus Expenditures of Student Funds in Violation of *Carroll*

158.    Since the *Carroll* decisions, the CUNY Board of Trustees and the Brooklyn

College President have been required to monitor NYPIRG funding to avoid forced association

and other violations of the First Amendment.

159.    In contrast to the State University of New York ("SUNY") and SUNY-affiliated

public colleges as reported in *Amidon*, Defendants do not have a contract with NYPIRG. (Letter

from Vice Chancellor for Student Affairs Elsa Nunez to Olivia Almengor, dated February 20,

1996.)

160.    Defendants have enacted regulations relating to financial disclosure and proof of

appropriate expenditures under *Carroll*, but do not enforce them, resulting in violations of

Plaintiffs' constitutional rights.

161.    Under CUNY regulations, NYPIRG may use student activity fees

> for activities, projects and expenses which involve and/or are for
> the benefit of that college's students. This requirement is satisfied
> by the funding of activities and projects which occur on, and all
> expenses incurred at the college's campus, and by the funding of
> the following: (1) activities that foster a "market place of ideas"
> on the college's campus; (2) activities that provide the college
> students with hands-on educational experiences; and (3)
> extracurricular activities for the college's students, both on and off
> the college's campus, that fulfil the University's objectives.

> *Examples of impermissible expenditures from a college's student
> activity fees are payments for the non-student lobbyists, state-wide
> (central office) administrative costs, and financing other college
> chapters.*

(CUNY Fiscal Accountability Handbook, XIV.A, emphasis added.)

162.    NYPIRG is required to provide an annual report to the Chancellor for the

appropriate Board of Trustees committee detailing "the activities, benefits and finances as they

pertain to the entire university, as well as each of the colleges where students are paying a

NYPIRG fee." (CUNY Fiscal Accountability Handbook, XIV.B.)

163.    As for each college, including Brooklyn College,

> NYPIRG shall provide the president of each college where
> NYPIRG is funded through the student activity fee with a copy of
> the portion of the CUNY annual report for that college, for his/her
> review, within 90 days of the end of NYPIRG's fiscal year (August
> 31), *and shall simultaneously provide a copy to the reference
> librarian of that college which shall be maintained on file at the
> library.*

(CUNY Fiscal Accountability Handbook, XIV.C, emphasis added.)

164.    The CUNY and Brooklyn College regulations described in the preceding

paragraphs are purported implementations of *Carroll* which: (1) required that all funds NYPIRG

receives from student activity fees be expended either on the campus from which they derive or

for "the benefit of students" from that campus; and (2) prohibited the use of student fee money

for certain expenses, including administrative costs at NYPIRG's main office and the salaries of

non-student lobbyists.

165.    In violation of Brooklyn College's disclosure requirement, the most recent, and

the only, NYPIRG report to the college president on file in the Brooklyn College library is from

2001.

166.    Ms. Schain, one of the plaintiffs in this action, asked the Brooklyn College library to contact Defendant Kimmich to arrange for filing of the required reports. (Email of Marissa Schain, dated July 19, 2008.) As of the date of the filing of this Complaint, neither Defendant Kimmich nor NYPIRG provided the Brooklyn College library or Ms. Schain with any of NYPIRG's annual reports after 2001, all of which were required to be on file within 90 days after the end of their respective fiscal years.

167.    The same day, Ms. Schain requested copies of NYPIRG's financial report to CUNY. (Letter from Marissa Schain to Vice Chancellor of Student Affairs Garie W. Moore, dated July 19, 2008.) As of the date of the filing of this Complaint, Ms. Schain has not received NYPIRG's reports to CUNY either.

168.    In addition to nonenforcement of their own disclosure requirements, Defendants have not enforced *Carroll*'s spending restrictions.

169.    Plaintiffs do have the NYPIRG reports to Brooklyn College and CUNY for 2000.

170.    In the report to the Brooklyn College President, NYPIRG breaks down its spending at each of its college chapters into the following categories:  (1) Project Coordinators; (2) Regional Supervision and Operating Expenses; and (3) a list of Campus Projects on a variety of issues (NYPIRG report for Brooklyn College, 1999-2000.)

171.    In the report to the CUNY Board of Trustees, the accumulated expense that NYPIRG claimed to have allocated to Campus Projects was $624,124.18. (NYPIRG report for "All Campus Activities - Statewide, 1999-2000.")

172.    As presented in NYPIRG's report to CUNY, the expenses that NYPIRG allocates to Campus Projects do not include the costs of its campus-based project coordinators (presumably salary-related) or those for Regional Supervision and Operating Expenses.

34

173.   Thus, NYPIRG's Campus Project expenses as portrayed to CUNY (*i.e.*, as being over and above the salary costs of its campus staff and regional supervision and operations) must include only those costs associated with such things as events, supplies, etc., "for the benefit of students" at the campuses.

174.   The Campus Project expenses that NYPIRG represents to CUNY as being over and above the salary costs of its campus staff and regional supervision and operations appear to include substantial hidden salary and operating costs—costs that cannot be legally charged to students under *Carroll*.

175.   This can be seen for the 2000 fiscal year, which, on information and belief, represents a typical year for NYPIRG expenditures.

176.   NYPIRG's IRS Form 990 tax filing for 2000 shows that it reported total expenses of $1,532,984. Of that total, $849,536 represents program service salary costs (the sum of lines 25b through 29b); $51,150 represents program services rent for its off-campus headquarters (line 36b); and $375,787 represents NYPIRG's total management and general costs (line 44c). Together, these salary, off-campus rent, and management costs equal $1,276,473. Subtracting NYPIRG's total salary, off-campus rent, and management costs ($1,276,473) from its total expenses ($1,532,984) yields a residue of $256,511.

177.   Thus, according to its IRS filing, NYPIRG could have spent no more than $256,511 on Campus Projects, given that $1,276,473 of its total $1,532,984 budget is consumed in salaries, rent, and management costs. But in its financial report to CUNY, NYPIRG claimed to have spent $624,124.18 on Campus Projects, which it portrays as excluding the salaries of its campus staff and regional supervision and operations.

178.    Because the IRS filing shows that NYPIRG had only $256,511 left in its budget after its salary, off-campus rent, and management costs were paid, the $624,124.18 that NYPIRG claimed to have spent on Campus Projects must have included $367,613.18 in salary and management costs (*i.e.*, the difference between NYPIRG's claimed campus project costs of $624,124.18 and the actual possible cost of $256,511).

179.    The $367,613.18 in salary and management costs calculated here does not necessarily reveal the full extent to which NYPIRG charges students for management costs in violation of *Carroll*, because it is unclear whether all of the Regional Supervision and Operating Expenses that NYPIRG *acknowledges* on its financial report to CUNY are *actually* spent to benefit students at the various CUNY campuses from which NYPIRG extracts fees.

180.    Upon information and belief, NYPIRG's CUNY and Brooklyn College reports after 2001 will contain additional evidence that NYPIRG spends student fees in violation of *Carroll* and university regulations with the approval of Defendants and/or that NYPIRG's reports provide inadequate support for its expenditure of student fees.

## FIRST CAUSE OF ACTION

181.    Plaintiffs repeat and reallege all the proceeding paragraphs of this complaint as if fully set forth herein.

182.    Defendants have violated Plaintiffs' rights guaranteed by the First and Fourteenth Amendments of the United States Constitution by permitting the funding of NYPIRG, an ideological group, by use of student referenda.

## SECOND CAUSE OF ACTION

183.    Plaintiffs repeat and reallege all the proceeding paragraphs of this complaint as if fully set forth herein.

184.    Defendants have violated Plaintiffs' rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and their rights to Equal Protection under the Fourteenth Amendment by exempting the NYPIRG fee from fiscal rules applicable to all other RSOs.

## THIRD CAUSE OF ACTION

185.    Plaintiffs repeat and reallege all the proceeding paragraphs of this complaint as if fully set forth herein.

186.    Defendants have violated Plaintiffs' rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and their rights to Equal Protection under the Fourteenth Amendment by permitting NYPIRG, an organization composed of full-time non-student professionals and a partner of CUNY, to dominate the public forum created by funding through the mandatory student activity fee.

## FOURTH CAUSE OF ACTION

187.    Plaintiffs repeat and reallege all the proceeding paragraphs of this complaint as if fully set forth herein.

188.    Defendants have violated Plaintiffs' rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and their rights to Due Process and Equal Protection under the Fourteenth Amendment by not enforcing their own disclosure requirements against NYPIRG and by allowing NYPIRG to spend student activity fees in violation of the Second Circuit's holding in *Carroll*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask this Court to:

A.     Enter judgment in Plaintiffs' favor;

B.     Declare that Defendants' policy of funding NYPIRG by referendum unconstitutional and enjoin such method of funding;

C.     Declare that Defendants' granting NYPIRG preferential exemption from fiscal controls applicable to other RSOs unconstitutional and enjoin such differential and favorable treatment for NYPIRG;

D.     Declare that Defendants have permitted NYPIRG, as an off-campus organization composed of full-time professionals and a partner of CUNY and Brooklyn College, to dominate the forum in violation of Plaintiffs' constitutional rights and enjoin them from funding NYPIRG with money from the mandatory student activity fee;

E.     Declare that Defendants have permitted NYPIRG to violate the disclosure requirements of their own regulations in violation of Plaintiffs' First Amendment rights and their Due Process rights under the Fourteenth Amendment;

F.     Declare that Defendants have permitted NYPIRG to expend student funds on activities that are proscribed under *Carroll* and Defendants' own regulations and order them to prevent further misallocation of existing student funds in NYPIRG's possession;

G.     Award Plaintiffs $1.00 in nominal damages;

H.     Award Plaintiffs the cost of prosecuting this action together with attorney fees pursuant to 42 U.S.C. § 1988; and

I.    Grant other and different relief that the Court deems just and proper.

Dated: July 24, 2008

Phineas E. Leahey
*Counsel of Record*

Todd R. Geremia
Phineas E. Leahey
JONES DAY
222 E. 41st Street
New York, N.Y. 10017
(212) 326-3939

*Attorneys for Plaintiffs*